

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00024-CR

_____

JAMES ARTHUR PRESTON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1543103D

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A grand jury charged Appellant James Arthur Preston with two counts of aggravated sexual assault of a child and one count of indecency with a child by contact. A jury convicted Preston on all counts and assessed his punishment at eighteen years' confinement for each count of aggravated sexual assault of a child and five years' confinement for the indecency count. Preston has appealed his convictions and sentences and briefed two issues for our review. Because neither issue presents reversible error, we will affirm.

## II. BACKGROUND

Because Preston does not challenge the sufficiency of the evidence supporting his convictions, we will summarize only the facts relevant to his appellate issues.

### A. Allegations against Preston and Subsequent Investigation

Preston was in a relationship with Mother[1] for about twenty years. Mother's three children—T.L., D.L., and R.M.—called him "Sock" or "Stepdad." To T.L., Preston was her stepfather. One day in 2016, T.L. reported that Preston had touched her inappropriately. She first contacted her mother, who then called 911. T.L. told Officer Dustin Durham of the Arlington Police Department that Preston "had

---

[1]We refer to the complainant and family members by aliases to protect the minors' privacy. *See Perez v. State*, 562 S.W.3d 676, 680 (Tex. App.—Fort Worth 2018, pet. ref'd).

touched her down there." Officer Durham clarified that T.L. meant Preston had touched her vagina. She said that Preston then pulled her panties to the side, licked her vagina, and penetrated her vagina with his fingers. T.L. told Officer Durham that Preston went and checked on D.L., and while he was gone, she texted her mother to tell her what had happened. She then told Officer Durham that Preston came back and "did the same thing again."

Later that day, another officer escorted the family to a local hospital, where T.L. was examined by a sexual assault nurse examiner (SANE). Based on what T.L. told her, the SANE collected swabs of T.L.'s vaginal area. DNA testing on two swabs from T.L.'s sexual assault kit revealed a mixed DNA profile that had a major female contributor and a minor male contributor.

## B. Preston's Apprehension and Additional DNA Evidence

Eventually, Preston was arrested.[2] By then, a new detective, Morgan Spear, had taken over the case. She obtained a search warrant and collected DNA from Preston

---

[2]It is not clear from the record why it took so long to apprehend Preston or even when exactly he was apprehended. Police interviewed T.L. and her mother and brother on October 11, 2016. T.L. testified at trial that she remembered the police "trying to figure out where he was and still [not being able to] find him" that day. She also testified that "a couple of months" after that, Preston moved back in with them, and they all lived together for "a year . . . or so" at a different location. However, Mother testified that she had not cohabitated with Preston since October 2016. The original detective assigned to this case testified that he had "obtained an arrest warrant on November 26th." The indictment in this case was filed on July 20, 2018. The search warrant for Preston's DNA was dated September 6, 2018, and another detective testified that, at that point, a suspect had been arrested. The first detective testified that he believed Preston "was arrested in '18."

3

by swabbing the inside of his mouth with buccal swabs. The same technologist who performed the testing on the known DNA samples taken from T.L. also performed testing on Preston's DNA sample. Those test results were then analyzed by a forensic DNA analyst, who reported that Preston "could not be excluded as the minor contributor" in the mixture on the swabs from T.L.'s labia majora and that "Preston or any male patrilineal relative could not be excluded as the contributor" of the Y chromosome DNA profile obtained from both the labia majora and labia minora swabs.

## C. Trial

At trial, Detective Spear testified that she had executed a search warrant for Preston's DNA by taking two buccal swabs from the inside of his mouth. She identified State's Exhibits 4 and 4A as the envelope in which she had packaged the buccal swabs "and then [the] buccal swabs themselves," respectively. She testified that the buccal swabs themselves looked familiar but that she did not write any of the writing on the back of the swab packaging. When the State first offered Exhibits 4 and 4A into evidence, Preston objected that "the chain of custody ha[d no]t been fully established." The trial court sustained the objection.

Detective Spear identified State's Exhibit 4 as the evidence envelope that she had filled out for the buccal swabs. She recognized the envelope by her own handwriting, her name, her badge number, and Preston's name. She identified State's Exhibit 4A as the sealed cotton swabs that she had torn open, as well as the swabs

4

inside the swab packaging. Detective Spear believed the writing on the packaging to be "from the lab." The State again moved to admit Exhibits 4 and 4A, and Preston objected that "someone else ha[d] opened . . . and handled this."[3] The trial court sustained the objection as to State's Exhibit 4A but admitted State's Exhibit 4, the envelope. Detective Spear then testified that State's Exhibits 4 and 4A were unique items based on the writing on the outside of the envelope that she recognized, which she reaffirmed was her handwriting. She also testified that nothing about State's Exhibit 4A appeared to have been altered.

The State's next witness was Farrah Plopper, the forensic DNA analyst who had tested the swabs from T.L.'s labia minora and labia majora, had obtained the DNA profiles from those swabs, had analyzed the results, and had compared the results to Preston's buccal sample. She testified that the markings on State's Exhibit 4A were unique and had been put on there by her lab, the University of North Texas Center for Human Identification. The State then offered State's Exhibit 4A again, but after Plopper testified that she had not put the markings on Exhibit 4A and that someone else had handled it, Preston objected "that the proper chain of custody ha[d] not been established as to the item of evidence." The trial court sustained the objection.

---

[3]This time, Preston limited his objection to State's Exhibit 4A, the buccal swabs.

5

Plopper then testified that she "did not actually handle the swab" within the lab. However, she also testified that her case file contained the chain of custody for the buccal swab collected from Preston, that there were no concerns in the way that the piece of evidence was handled and processed throughout the lab, that she did not have any concerns that the item marked as State's Exhibit 4A was a buccal swab collected from Preston, and that the buccal swab "was compared to profiles obtained from the sexual assault kit." The State again moved to admit Exhibit 4A, and Preston renewed his objection "as to not establishing the chain of custody."

The trial court then, outside the jury's presence, admitted State's Exhibit 4A for the record only. While the jury was out, Plopper testified that the markings on State's Exhibit 4A were the "case number and item number, but it also [had] the initials of our technologist that did the test." After hearing from the State, the trial court asked Preston to clarify that his objection was "just chain," and Preston responded, "Yes, there's other people in this chain of custody that she cannot vouch for herself. Again, it is conclusory." The trial court sustained that objection.

The trial court then brought the jury back in, and Plopper identified the markings on State's Exhibit 4A as "the case and item number, 16-2772.4, as well as the initials DY and the date, 10-8-18." Plopper testified that she knew that "DY" was Darice Yoshishige, a technologist in the lab. Plopper further testified that Yoshishige "would have cut approximately half of one of the swabs [marked as State's Exhibit 4A], performed DNA extraction on it, . . . and then amplified the DNA and

6

loaded it on the genetic analyzer." The State then offered Exhibit 4A one final time, and Preston renewed his objection "as to the chain of custody since that witness has not been here to testify as to what she did." The trial court overruled the objection and admitted State's Exhibit 4A. Plopper was allowed to testify about her DNA analysis and comparison of the profiles that she had obtained from the labial swabs to the known DNA samples of T.L. and Preston. The jury found Appellant guilty of all three counts submitted to it.

The jury heard more testimony and arguments at the trial on punishment and assessed Preston's punishment at eighteen years' confinement for each count of aggravated sexual assault of a child and five years' confinement for indecency with a child by contact.[4] The State made an oral motion "to stack the verdicts under Texas Penal Code [Section 3.03](b)(2)(A)," and the trial court ordered Preston to serve his sentences consecutively in order of the counts. *See* Tex. Penal Code Ann. § 3.03(b)(2)(A).

### III. DISCUSSION

On appeal, Preston argues that the trial court erred (1) by allowing the State to admit into evidence the DNA swabs taken from Preston when the State failed to properly authenticate the evidence and (2) by stacking the sentences in violation of

---

[4]The jury assessed no fine on all three counts.

7

Preston's Eighth Amendment protection against cruel and unusual punishment. For the reasons that follow, we reject these arguments.

## A. No Abuse of Discretion in Admitting State's Exhibit 4A

In his first issue, Preston argues that the trial court erroneously allowed the State to admit State's Exhibit 4A, the buccal swabs, into evidence when the State failed to properly authenticate the evidence. The State responds that the trial court did not err by overruling Preston's "objection that the State had failed to authenticate the buccal swab."

We first note that we are unsure whether Preston has preserved a complaint regarding the admissibility of this evidence. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Preston's objections to State's Exhibit 4A at trial all regarded the chain of custody. "Absent evidence of tampering, issues regarding the chain of custody bear on the weight, rather than on the admissibility, of evidence." *Davis v. State*, 313 S.W.3d 317, 348 (Tex. Crim. App. 2010). On appeal, both parties treat Preston's "chain of custody" objection as an authentication objection. *See* Tex. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Citing a case from another court of

appeals, Preston contends that a "chain of custody" challenge "is really an attack on the authenticity of the evidence under Rule 901 of the Texas Rules of Evidence." *See Davis v. State*, 992 S.W.2d 8, 10–11 (Tex. App.—Houston [1st Dist.] 1996, no pet.) ("An objection to the chain of custody is similar to an objection to inadequate authentication or identification in that both objections complain of the lack of the proper predicate to admitting the item in question."). We have reviewed "chain of custody" complaints as complaints that evidence was not authenticated under Rule 901, even when the appellant's trial objection did not mention authentication or the rule. *See LopezGamez v. State*, 622 S.W.3d 445, 457–58 (Tex. App.—Fort Worth 2020, pet. ref'd); *Washington v. State*, No. 02-13-00526-CR, 2015 WL 505172, at *5–6 (Tex. App.—Fort Worth Feb. 5, 2015, pet. ref'd) (mem. op., not designated for publication). In keeping with that practice, we will review Preston's first appellate issue as though he preserved a complaint that State's Exhibit 4A was inadmissible because the State failed to authenticate it under Rule 901.

We review a trial court's decision to admit evidence for an abuse of discretion. *Wright v. State*, 618 S.W.3d 887, 890 (Tex. App.—Fort Worth 2021, no pet.). Under this standard, the trial court's decision to admit evidence will be upheld as long as it was within the zone of reasonable disagreement. *Id.*

Proof of the beginning and end of the chain of custody will support admission of the evidence barring any showing of tampering or alteration. *Hall v. State,* 13 S.W.3d 115, 120 (Tex. App.—Fort Worth 2000), *pet. dism'd, improvidently granted,*

9

46 S.W.3d 264 (Tex. Crim. App. 2001). Preston contends that "the State failed to properly establish either the beginning or the end of the chain of custody for State's Exhibit 4A." We disagree. Detective Spear's testimony—and the envelope admitted without objection as State's Exhibit 4—established that she had torn open a package of cotton swabs, had swabbed the inside of Preston's mouth with the swabs, had sealed the swabs (in their original packaging) inside an evidence envelope, and had written distinctive identifying information on the outside of the envelope. She identified Preston as the person from whom she had collected the buccal swab. Generally, tagging an item of physical evidence at the time of its seizure and then identifying it at trial based upon the tag is sufficient for admission barring any showing by the defendant of tampering or alteration. *Sneed v. State*, 875 S.W.2d 792, 794 (Tex. App.—Fort Worth 1994, no pet.). Here, there was no showing that Exhibit 4 or 4A was tampered with in any way, and Preston does not claim otherwise. The only "alteration" to either exhibit was the cutting of one of the swabs for testing purposes and the writing on the swab packaging, both done by Darice Yoshishige. There is nothing apparent from the record to intimate, suggest, or otherwise indicate that the buccal swabs admitted as State's Exhibit 4A were anything other than what the State claimed they were—swabs of Preston's DNA collected by Detective Spear and then tested by the lab at the Center for Human Identification.

Preston argues that Spear and Plopper never "conclusively" testified to the predicate facts the State needed to authenticate or identify State's Exhibit 4A. His

10

argument attempts to impose a burden on the State that the Rules of Evidence do not require. Rule 901 does not require the State to "conclusively" establish that an item of evidence is what the State claims it is; in fact, we have said that the rule "does not require the State to prove anything." *State v. Webb*, 980 S.W.2d 924, 925 (Tex. App.— Fort Worth 1998) (op. on reh'g), *aff'd*, 12 S.W.3d 808 (Tex. Crim. App. 2000). "It requires only a showing that satisfies the trial court that the matter in question is what the State claims; once that showing is made, the exhibit is admissible." *Id.* at 925–26. If a trial court finds that a reasonable juror could find that the evidence was authenticated, then the evidence should be admitted. *See Pondexter v. State*, 942 S.W.2d 577, 586 (Tex. Crim. App. 1996).

Preston relies on *Brown v. State*, 240 S.W.2d 310, 310–11 (Tex. Crim. App. 1951), to support his contention that the "beginning of the chain of custody was not established, and State's Exhibit 4A was not properly authenticated." In *Brown*, a blood specimen was taken from the defendant by a nurse in the presence of a police officer, who testified that it was placed in a tube by the nurse and left at the hospital. *Id.* at 310. A doctor testified that "the blood specimen was called to his attention by . . . a laboratory technician in his employ, after it had been labeled with the name N. Brown and sealed with paraffin, and that he sent it to Austin for analysis." *Id.* A chemist for the Department of Public Safety testified over objection that the specimen received by mail from the doctor and labeled with the name of "N Brown" contained "3.6 milligrams of alcohol per cc." *Id.* at 310–11. The results of the blood test were

admitted over multiple objections, including that it had not been shown that the specimen examined by the chemist was that taken from the defendant. *Id.* at 311. The Court of Criminal Appeals held that the doctor's testimony, "excluding the hearsay statements offered over objection," was not sufficient to establish that the specimen taken by the nurse was the same specimen that was forwarded by the doctor to the Department of Public Safety at Austin. *Id.*

*Brown* is distinguishable. The nurse who drew the blood in *Brown* did not testify. *Id.* at 310. Here, Detective Spear testified that she had swabbed the inside of Preston's mouth with two buccal swabs, and she identified the buccal swabs marked as State's Exhibit 4A as the swabs she had taken from Preston. Also, Preston did not make a hearsay objection to her testimony or to Plopper's testimony.[5] "Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay." Tex. R. Evid. 802.

Even if *Brown* supported Preston's argument, the Court of Criminal Appeals has since said that the State is not required to prove a chain of custody if a witness could authenticate the exhibit by other means, such as its distinctive characteristics. *Gardner v. State*, 306 S.W.3d 274, 292–93 n.35 (Tex. Crim. App. 2009). Here, Plopper identified the distinctive markings on the swab packaging, and Detective Spear identified her own handwriting and the identifying information on the outside of the

---

[5]After the buccal swabs were admitted, Preston made a hearsay objection to a different exhibit, a copy of Plopper's forensic DNA report issued in 2018.

envelope in which she had placed the buccal swabs. Testimony that an item is what it is claimed to be, a nonexpert's opinion that handwriting is genuine (based on a familiarity with it that was not acquired for the current litigation), and distinctive characteristics of the item all satisfy the requirement of authenticating or identifying an item of evidence. Tex. R. Evid. 901(b)(1), (2), (4).

The trial court did not abuse its discretion when it admitted State's Exhibit 4A. We overrule Preston's first issue.

## B. Punishment Argument Not Preserved

In his second issue, Preston argues that the trial court violated his Eighth Amendment protection against cruel and unusual punishment by stacking his sentences. The State responds that Preston failed to preserve this issue for appeal. We agree with the State.

Generally, an appellant may not complain about his sentence, other than an illegal-sentence claim, for the first time on appeal. *Burg v. State*, 592 S.W.3d 444, 451 (Tex. Crim. App. 2020); *Bonilla v. State*, 452 S.W.3d 811, 817–18 (Tex. Crim. App. 2014); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Mercado v. State*, 718 S.W.2d 291, 296 (Tex. Crim. App. 1986). To preserve for appellate review a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. Tex. R. App. P. 33.1(a); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd).

Nothing in the record indicates that Preston ever presented his sentencing complaint to the trial court. He did not object—or make any counterargument—when the State asked the trial court to stack his sentences. Before pronouncing sentence, the trial court asked, "Is there any legal reason why this defendant should not now be sentenced at this time?" Preston said only, "No legal reason, Judge." He did not object after the trial court ordered that his sentences would "run consecutively in order of the counts," nor did he make the argument that he now makes on appeal in the motion for new trial filed ten days after he was sentenced.[6] Under these circumstances, Preston has failed to preserve his claim. *Cf. Sample v. State*, 405 S.W.3d 295, 304 (Tex. App.—Fort Worth 2013, pet. ref'd). Accordingly, we overrule Preston's second issue.

## IV. CONCLUSION

Having overruled Preston's issues, we affirm the trial court's judgments.

---

[6]Even if we determined a disproportionality did exist between the gravity of Preston's offense and the punishment assessed, there is no evidence in the record reflecting sentences imposed for similar offenses on criminals in Texas or other jurisdictions—necessary information for a reviewing court to conduct a proper Eighth Amendment cruel-and-unusual-punishment analysis. *See Solem v. Helm*, 463 U.S. 277, 292, 103 S. Ct. 3001, 3011 (1983) (explaining that disproportionality analysis includes comparison of the sentence received to sentences for similar crimes in the jurisdiction and sentences for the same crime in other jurisdictions); *see also Hulsey v. State*, No. 02-12-00205-CR, 2013 WL 627019, at *2 n.2 (Tex. App.—Fort Worth Feb. 21, 2013, pet. ref'd) (mem. op., not designated for publication).

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 20, 2023